UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                        :

BEATRIZ SAAVEDRA, ERIKA ALFARO,     :
and JASBLEIDY MONTEJO, individually and  :
on behalf of others similarly situated,      :

                                          :

               Plaintiffs,           :

                                          :

              -against-         :

                                          :

THE TWIN KITTY BAKERY CORP., d/ b/ a LA :
GATA GOLOSA, TWO BROTHERS BAKERY  :
CORP., d/ b/ a LA GATA GOLOSA, SWEET KISS :
CORP., d/ b/ a LA GATA GOLOSA, 8263 BAKERY :
CORP., d/ b/ a LA GATA GOLOSA, JOHN  :
CASTRO, JOSE CASTRO, WENDY A CASTRO, and :
MAX CASTRO,                         :

                                          :

              Defendants.       :

                                          :

------------------------------------------------------------------- X

**REPORT AND
RECOMMENDATION**
1:18-cv-00932 (PKC)(PK)

**Peggy Kuo, United States Magistrate Judge:**

On February 13, 2018, Plaintiffs Beatriz Saavedra, Erika Alfaro, and Jasbleidy Montejo (collectively, "Plaintiffs") commenced an action against The Twin Kitty Bakery Corp., Two Brothers Bakery Corp., Sweet Kiss Corp., 8263 Bakery Corp., John Castro, Jose Castro, Wendy A. Castro, and Max Castro (collectively, "Defendants") for violations of the Fair Labor Standards Act ("FLSA"), the New York Minimum Wage Act, and the New York Labor Law ("NYLL"). (*See* Compl., Dkt. 1.)

Before the Court on referral from the Honorable Pamela K. Chen is Plaintiffs' Motion for Default Judgment against Twin Kitty Bakery Corp., Two Brothers Bakery Corp., Sweet Kiss Corp., John Castro, and Jose Castro (collectively, "Defaulting Defendants").[1] (Dkts. 62-64.) For the reasons

---

[1] Plaintiffs entered into a stipulation of discontinuance with Max Castro on December 12, 2018, which was so ordered the same day. *See* Dkt. 29. Plaintiffs also entered into a settlement agreement with defendants 8263 Bakery Corp. and Wendy Castro. Dkt. 50.

stated herein, the undersigned respectfully recommends that the Motion be granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are taken from the Complaint, the Declaration of Beatriz Saavedra in Support of the Motion for Default Judgment ("Saavedra Declaration," Dkt. 63-13), the Declaration of Erika Alfaro in Support of the Motion for Default Judgment ("Alfaro Declaration," Dkt. 63-14), and the Declaration of Jasbleidy Montejo in Support of the Motion for Default Judgment ("Montejo Declaration," Dkt. 63-15).

## I.     Facts Common to All Plaintiffs

John Castro, Jose Castro, Wendy A. Castro, and Max Castro (collectively, "Individual Defendants") "own, operate, or control" a group of Colombian restaurants and bakeries.  (Compl. ¶ 2; *see also id.* ¶ 31 ("Individual Defendants John Castro, Jose Castro, Wendy A Castro, and Max Castro, possess operational control over Defendant Corporations, possess ownership interests in Defendant Corporations, and control significant functions of Defendant Corporations.").)   The three bakeries are located at: (1) 82-63 Broadway, Elmhurst, New York 11373 ("Broadway Location"); (2) 89-01 37th Avenue, Jackson Heights, New York 11372 ("37th Avenue Location"); and (3) 81-20 Roosevelt Avenue, Jackson Heights, New York 11372 ("Roosevelt Avenue Location").  (*Id.* ¶ 2.)

Defendants employed Plaintiffs "as waitresses and cashiers."  (*Id.* ¶¶ 4, 5.)  Defendants "had the power to hire and fire [Plaintiffs], control [the] terms and conditions of [Plaintiffs'] employment, and determine the rate and method of [Plaintiffs'] compensation."  (Saavedra Decl. ¶ 5; Alfaro Decl. ¶ 5; Montejo Decl. ¶ 5.)  Plaintiffs allege that "Defendants maintained a policy and practice requiring Plaintiffs (and all similarly situated employees) to work in excess of 40 hours a week."  (Compl. ¶ 125;

*see also id.* ¶¶ 7, 13.)[2]  Defendants did not provide Plaintiffs with "appropriate minimum wage and overtime compensation for the hours that they worked."  (*Id.* ¶ 7; *see also id.* ¶ 126.)

Defendants avoided properly compensating Plaintiffs in part by misclassifying them on Defendants' books.  "Defendants classified [ ] Plaintiffs and [certain other employees] as tipped employees," meaning Plaintiffs received tips from customers as part of their work for Defendants. (*Id.* ¶ 136; *see also id.* ¶¶ 137-38.)  As "tipped employees," Defendants could pay Plaintiffs at a rate lower than the minimum wage.  (*See id.* ¶¶ 61, 87, 116, 131-34.)  Nevertheless, the "actual duties" of Plaintiffs and the other waitresses "included a significant amount of time spent performing non-tipped duties."  (*Id.* ¶ 131.)  These duties included "cleaning the restaurants, tables, windows and bathrooms, cooking, preparing food, stocking and organizing merchandise in the store, bringing supplies from the basement to the main floor, mopping, sweeping, taking out trash, [and] preparing coffee."  (*Id.* ¶ 6.) This work was "not incidental" to the waitresses' duties.  (*Id.* ¶ 135.)  Plaintiffs estimate that they each spent over twenty percent "of each day performing non-tipped work."  (*Id.* ¶¶ 45, 73, 99; *see also* Saavedra Decl. ¶ 7; Alfaro Decl. ¶ 7; Montejo Decl. ¶ 7.)  "Defendants failed to inform Plaintiffs who received tips that Defendants intended to take a deduction against Plaintiffs' earned wages for tip income . . . ."  (Compl. ¶ 137.)  As a result of these non-tipped responsibilities, Defendants "should have classified [Plaintiffs] as non-tipped employees and paid [Plaintiffs] at the minimum wage rate." (*Id.* ¶ 136.)

Plaintiffs allege they were paid their wages in cash, regularly handled goods in interstate commerce, and performed duties that "required neither discretion nor independent judgment."  (*Id.* ¶ 46-47, 52, 74-75, 79, 100-01, 108.)

---

[2] As set forth in greater detail below, although Plaintiffs allege generally that they worked in excess of forty hours per week, Alfaro does not allege that she specifically worked more than forty hours per week at any point during her employment by Defendants.  (*See* Compl. ¶¶ 76-78.)

Plaintiffs also allege that "Defendants willfully disregarded and purposefully evaded recordkeeping requirements of the FLSA and NYLL by failing to maintain accurate and complete timesheets and payroll records." (*Id.* ¶ 129.)  To Plaintiffs' knowledge, "Defendants [did not] utilize any time tracking device . . . that accurately reflected Plaintiffs' actual hours worked." (*Id.* ¶¶ 63, 89, 118.)  Plaintiffs were not required to keep track of their time.  (*Id.*)

Defendants did not "maintain a record of tips earned by Plaintiffs [when they] worked as waitresses." (*Id.* ¶ 139.)  They never notified Plaintiffs "that their tips were being credited towards the payment of the minimum wage." (*Id.* ¶ 138; *see also id.* ¶¶ 61, 87, 116.)  Defendants also did not "account for these tips in any daily or weekly accounting of Plaintiff[s'] wages." (*Id.* ¶¶ 62, 88, 117.) Plaintiffs never received "accurate statement[s] of [their] wages," "notification [of] overtime [pay] and wages under" state and federal law, or notification (in English and Spanish, Plaintiffs' primary language) "of [their] rate of pay, [Plaintiffs'] regular pay day, and such other information as required by" the NYLL. (*Id.* ¶¶ 66-68, 92-94, 121-23; *see also id.* ¶¶ 143, 147, 148; Saavedra Decl. ¶¶ 19-21; Alfaro Decl. ¶¶ 19-20; Montejo Decl. ¶¶ 21-22.)

Plaintiffs were required "to sign a document the contents of which they were not allowed to review in order to release their wages." (Compl. ¶ 130; *see also id.* ¶¶ 64, 90, 119.)  Plaintiffs never received "any breaks or meal periods." (*Id.* ¶¶ 60, 86, 115.)  Defendants also "improper[ly] and illegal[ly] deduct[ed]" Plaintiffs' "wages to cover overhead expenses" and required Plaintiffs "to purchase 'tools of the trade,' with [their] own funds." (*Id.* ¶¶ 65, 69, 91, 95, 120, 124.)

These "practices," which, according to Plaintiffs, were part of a "corporate policy of minimizing labor costs," "were done willfully to disguise the actual number of hours Plaintiffs (and similarly situated individuals) worked, and to avoid paying Plaintiffs properly for their full hours worked." (*Id.* ¶¶ 144-45.)

## II.     Facts Specific to Each Plaintiff

### A.     *Saavedra*

Saavedra "was employed by Defendants at the [37th Avenue] and [Roosevelt Avenue] [L]ocations from approximately May 2012 until on or about September 13, 2017." (Compl. ¶ 18; *see also* Saavedra Decl. ¶ 6.)  Although Saavedra "regularly worked in excess of 40 hours per week" "[t]hroughout her employment with Defendants" (Compl. ¶ 48; *see also* Saavedra Decl. ¶ 8), her schedule changed over time:

- "From approximately May 2012 until on or about December 2012, Plaintiff Saavedra worked at [the 37th Avenue Location] from approximately 7:00 a.m. until on or about 3:00 p.m., 3 or 4 days a week and from approximately 3:00 p.m. until on or about 11:00 p.m., 3 days per week (typically 48 to 56 hours per week)." (Compl. ¶ 49; Saavedra Decl. ¶ 9.)

- "From approximately March 2013 until on or about January 2014, Plaintiff Saavedra worked at [the 37th Avenue Location] from approximately 7:00 a.m. until on or about 3:00 p.m. or from approximately 3:00 p.m. until on or about 11:00 p.m., 6 days a week (typically 48 hours per week)." (Compl. ¶ 50; *see also* Saavedra Decl. ¶ 10 (stating that Saavedra worked from 7:00 a.m. until 3:00 p.m. four days a week and from 3:00 p.m. until 11:00 p.m. two days a week).)

- "From approximately January 2014 until on or about September 13, 2017, Plaintiff Saavedra worked at [the 37th Avenue Location] from approximately 7:00 a.m. until on or about 3:00 p.m., 5 or 6 days a week (typically 40 to 48 hours per week)." (Compl. ¶ 51; Saavedra Decl. ¶ 11.)

Saavedra never received overtime compensation for her work in excess of forty hours per week.  (Saavedra Decl. ¶ 18.)

The information in the Saavedra Declaration regarding Saavedra's compensation differs from that in the Complaint, both in terms of the "fixed salary" amounts that Saavedra received and the periods of time over which Saavedra received those amounts.  This information is set forth in the table below.[3]

| Complaint | | Saavedra Declaration | |
|---|---|---|---|
| Date Range | Salary | Date Range | Salary |
| May 2012 – December 2012 | $48 per shift (¶ 53.) | May 2012 – December 2012 | $42 per shift (¶ 12.) |
| March 2013 – January 2014 | $52 per shift (¶ 54.) | January 2013 – January 2014[4] | $48 per shift (¶ 13.) |
| January 2014 – January 2017 | $60 per shift (¶ 55.) | January 2014 – December 2014 | $52 per shift (¶ 14.) |
| | | January 2015 – December 2016 | $60 per shift (¶ 15.) |
| January 2017 – May 2017 | $70 per shift (¶ 56.) | January 2017 – March 2017 | $70 per shift (¶ 16.) |
| May 2017 – September 2017 | $60 per shift (¶ 57.) | March 2017 – September 2017 | $60 per shift (¶ 17.) |

B.    *Alfaro*

Defendants employed Alfaro at the 37th Avenue Location "from approximately February 2013 until on or about September 2017."  (Compl. ¶ 19; Alfaro Decl. ¶ 6.)

Alfaro states that "[t]hroughout [her] employment with Defendants, [she] regularly worked in excess of 40 hours per week."  (Alfaro Decl. ¶ 8; *see also* Compl. ¶¶ 7, 13, 125.)  However, according to the specific allegations in the Complaint and her sworn Declaration, Alfaro never worked more than forty hours per week.  Her schedule was as follows:

---

[3] Because Plaintiffs signed the Declarations and swore to them under penalty of perjury (*see* Saavedra Decl. at 1, 4; Alfaro Decl. at 1, 4; Montejo Decl. at 1, 4), the information set forth therein is used to analyze Defendants' liability and Plaintiffs' damages when that information is inconsistent with the information in the Complaint.

[4] Neither the Complaint nor the Saavedra Declaration provides any information on the hours that Saavedra worked from January 2013 until the start of March 2013.  (*See* Compl. ¶¶ 49-50; Saavedra Decl. ¶¶ 9-10.)

- Alfaro worked one shift per day at the 37th Avenue Location from about February 2013 "until on or about January 2016." (*Id.* ¶ 76.) The shift was "from approximately 7:00 a.m. or 3:00 p.m. or 11:00 p.m. until on or about 3:00 p.m. or 11:00 p.m. or 7:00 a.m., 5 days a week (typically 40 hours per week)." (*Id.*; *see also* Alfaro Decl. ¶ 9 (stating that during this time period, Alfaro worked "from approximately 11:00 p.m. until on or about 7:00 a.m., 5 days a week (typically 40 hours per week)").)

- Alfaro worked one shift per day at the 37th Avenue Location from about January 2016 "until on or about October 2016." (Compl. ¶ 77; *see also* Alfaro Decl. ¶ 10.) The shift was "from approximately 7:00 a.m. or 3:00 p.m. or 11:00 p.m. until on or about 3:00 p.m. or 11:00 p.m. or 7:00 a.m., 4 days a week (typically 32 hours per week)." (Compl. ¶ 77; Alfaro Decl. ¶ 10.)

- Alfaro worked at the 37th Avenue Location from about October 2016 "until on or about September 2017." (Compl. ¶ 78; Alfaro Decl. ¶ 11.) She typically worked one shift a day, four to five days a week for a total of 32 to 40 hours per week. (*See* Compl. ¶ 78; Alfaro Decl. ¶ 11.)[5]

- The shift was from "approximately 7:00 a.m. or 3:00 p.m. or 11:00 p.m. until on or about 3:00 p.m. or 11:00 p.m. or 7:00 a.m., 4 to 5 days a week (typically 32 to 40 hours per week)." (Compl. ¶ 78; *see also* Alfaro Decl. ¶ 11.)

Alfaro states that she did not receive overtime compensation for work in excess of forty hours per week. (Alfaro Decl. ¶ 17.)

---

[5] Specifically, Alfaro states in her Declaration:

> From approximately October 2016 one shift per day until on or about September 2017, Plaintiff Alfaro worked at the 37th Street location from approximately 7:00 a.m. until on or about 3:00 p.m. or 11:00 p.m. until on or about 7:00 a.m., 4 to 5 days per week (typically 32 to 40 hours per week).

(Alfaro Decl. ¶ 11; *see also* Compl. ¶ 78.)

The information in the Alfaro Declaration regarding Alfaro's compensation differs from that in the Complaint, both in terms of the "fixed salary" amounts that Alfaro received and the periods of time over which Alfaro received those amounts.  This information is set forth in the table below.

| Complaint | | Alfaro Declaration | |
|---|---|---|---|
| Date Range | Salary | Date Range | Salary |
| February 2013 – March 2014 | $42 per shift (¶ 80.) | February 2013 – March 2014 | $48 per shift (¶ 12.) |
| March 2014 – March 2015 | $46 per shift (¶ 81.) | March 2014 – December 2014 | $52 per shift (¶ 13.) |
| March 2015 – March 2016 | $52 per shift (¶ 82.) | January 2015 – December 2016 | $60 per shift (¶ 14.) |
| March 2016 – September 2017 | $60 per shift (¶ 83.) | January 2017 – March 2017 | $70 per shift (¶ 15.) |
| | | March 2017 – September 2017 | $60 per shift (¶ 16.) |

### C.    *Montejo*

Defendants employed Montejo "from approximately June 2013 until on or about September 13, 2017" at the 37th Avenue and Broadway Locations.  (Compl. ¶ 96; Montejo Decl. ¶ 6.)

Although "Montejo regularly worked in excess of 40 hours per week" (Compl. ¶ 102, *see also* Montejo Decl. ¶ 8), her schedule changed over the course of her employment:

- "From approximately June 2013 until on or about August 2013, Plaintiff Montejo worked at the 37th [Avenue Location] from approximately 3:00 p.m. until on or about 11:00 p.m. or 12:00 a.m., 7 days a week (typically 56 to 63 hours per week)."  (Compl. ¶ 103; *see also* Montejo Decl. ¶ 9.)

- "From approximately September 2013 until on or about June 2014, Plaintiff Montejo worked at [the Broadway Location] from approximately 3:00 p.m. until on or about 12:00 a.m., 6 days a week (typically 54 hours per week)."  (Compl. ¶ 104; *see also* Montejo Decl. ¶ 10.)

- "From approximately July 2014 until on or about December 2015, Plaintiff Montejo worked at [the Broadway Location] from approximately 3:00 p.m. until on or about 12:00 a.m., 5 days a week (typically 45 hours per week)."  (Compl. ¶ 105; *see also* Montejo Decl. ¶ 11.)

- "From approximately January 2016 until on or about May 2017, Plaintiff Montejo worked at [the 37th Avenue and Broadway Locations] from approximately 3:00 p.m. until on or about 12:00 a.m., 4 days a week (typically 36 hours per week)."  (Compl. ¶ 106; *see also* Montejo Decl. ¶ 12.)

- "From approximately May 2017 until on or about September 13, 2017, [Montejo] worked at the 37th [Avenue] [L]ocations [sic] from approximately 3:00 p.m. until on or about 11:00 p.m., 2 or three days a week (typically 18 to 27 hours per week)."  (Montejo Decl. ¶ 13.)[6]

Montejo never received overtime compensation for her work in excess of forty hours per week.  (*Id.* ¶ 19.)

The information in the Montejo Declaration regarding Montejo's compensation differs from that in the Complaint, both in terms of the "fixed salary" amounts that Montejo received and the periods of time over which Montejo received those amounts.  This information is set forth in the table below.

| Complaint | | Montejo Declaration | |
|---|---|---|---|
| Date Range | Salary | Date Range | Salary |
| June 2013 – August 2013 | $52 per shift (¶ 109.) | June 2013 – December 2013 | $48 per shift (¶ 14.) |
| January 2014 – January 2017 | $60 per shift (¶ 110.) | January 2014 – December 2014 | $52 per shift (¶ 15.) |
| | | January 2015 – | $60 per shift (¶ 16.) |

---

[6] Montejo states that she worked "typically 18 to 27 hours per week."  (Montejo Decl. ¶ 13.)  However, based on the hours she set forth in her declaration, she worked eight hours a shift, two or three days a week (*see id.*), which is 16 to 24 hours per week.  The undersigned assumes the correct weekly hour totals are 16 to 24 hours. Further, the corresponding allegation in the Complaint states that Montejo worked during this period at both the Broadway and 37th Avenue Locations.  (Compl. ¶ 107.)

| | | December 2016 | |
|---|---|---|---|
| January 2017 – May 2017 | $70 per shift (¶ 111.) | January 2017 – March 2017 | $70 per shift (¶ 17.) |
| May 2017 – September 13, 2017 | $60 per shift (¶ 112.) | March 2017 – September 13, 2017 | $60 per shift (¶ 18.) |

**PROCEDURAL HISTORY**

Plaintiffs filed the Complaint on February 13, 2018 as a putative collective action under 29 U.S.C. § 216. (Compl. at 1.) Plaintiffs assert eight causes of action: (1) violation of the minimum wage provisions of the FLSA (*id.* ¶¶ 152-58); (2) violation of the overtime provisions of the FLSA (*id.* ¶¶ 159-62); (3) violation of the New York Minimum Wage Act (*id.* ¶¶ 163-67); (4) violation of the overtime provisions of the NYLL (*id.* ¶¶ 168-71); (5) violation of the notice and recordkeeping requirements of the NYLL (*id.* ¶¶ 172-74); (6) violation of the wage statement provisions of the NYLL (*id.* ¶¶ 175-77); (7) recovery of equipment costs (*id.* ¶¶ 178-80); and (8) unlawful deductions from wages in violation of the NYLL (*id.* ¶¶ 181-86).

Plaintiffs served process on the Defaulting Defendants on the following dates: Twin Kitty, Two Brothers, and Sweet Kiss were served on March 26, 2018 (Dkts. 7, 8, 9); John Castro was served on April 3, 2018 (Dkt. 12); and Jose Castro was served on April 27, 2018 (Dkt. 13). Plaintiffs requested a certificate of default for each of the Defaulting Defendants on July 3, 2019 (Dkts. 40, 41), which were issued on July 10, 2019 (Dkt. 42).

Plaintiffs filed their first Motion for Default Judgment on September 6, 2019. (Dkts. 44, 45.) Plaintiffs filed their second Motion for Default Judgment on March 12, 2020 (Dkt. 55)[7] and an Amended Memorandum in Support of their Motion for Default Judgment on May 20, 2020 (Dkt. 56). Because it was unclear which documents Plaintiffs intended to be considered as part of the Motion

---

[7] This document is entitled "Second Motion for Default Judgment" on the docket, but it bears the title "Memorandum of Law in Support of Plaintiff's Application for Default Judgment" on the document itself.

for Default Judgment, on July 12, 2020, Plaintiffs were directed "to file . . . a superseding and complete version of their Default Judgment Motion."   Plaintiffs filed their superseding Motion for Default Judgment on July 24, 2020 ("Motion").  (Dkts. 62-64.)

In Plaintiffs' Amended Memorandum of Law in Support of Plaintiffs' Application for Default Judgment ("Memorandum," Dkt. 64), Plaintiffs argue that they are entitled to a default judgment on their (1) unpaid minimum wage claims under the FLSA and the NYLL (Memo. at 8-9), (2) overtime wage claims under the FLSA and the NYLL (*id.*), and (3) violations of wage notice and wage statement requirements claims under the NYLL (*id.* at 9-10).  They seek liquidated damages under the NYLL (*id.* at 10), prejudgment interest (*id.*), attorneys' fees and costs (*id.* at 10-12), and an order that the "judgment shall automatically increase by fifteen percent," "if any amounts [of the judgment] remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is pending" (*id.* at 12-13).  Although Plaintiffs brought their claims as a putative collective action (*see* Compl. ¶¶ 149-51), they do not seek collective action certification in the Motion.

The Honorable Pamela K. Chen referred the Motion to the undersigned for a report and recommendation on January 17, 2021.

## **LEGAL STANDARD**

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process regarding default judgment.  First, the Clerk of Court enters a party's default when a defendant "has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  Then, the plaintiff can apply to the court for a default judgment.  Fed. R. Civ. P. 55(b)(2).  "[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right."  *Guideone Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010).  The Court must ensure that (1) the plaintiff took all the required procedural steps in moving for default judgment pursuant to Local Civil Rule 55.2(c); and

(2) the plaintiff's allegations, when accepted as true, establish liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

"[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability," *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), and the court draws all reasonable inferences in favor of the plaintiff. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). Nevertheless, a default is "not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158. Instead, the plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence and detailed affidavits. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991). The amount of damages awarded, if any, must be ascertained "with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

When a plaintiff claims FLSA and NYLL violations in the context of a default judgment, "the plaintiff's recollection and estimates of hours worked are presumed to be correct." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012); *see also Santillan v. Henao*, 822 F. Supp. 2d 284, 294 (E.D.N.Y. 2011) ("[I]n the absence of rebuttal by defendants, or where the employer has defaulted, as here, the employee's recollection and estimates of hours worked are presumed to be correct." (quotations, citations, and alterations omitted)). "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the recordkeeping requirements] of the [FLSA]." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946).

A court "possesses significant discretion" in granting a motion for default judgment, "including whether the grounds for default are clearly established and the amount of money potentially involved." *Klideris v. Trattoria El Greco*, No. 10-CV-4288 (JBW)(CLP), 2011 WL 7114003, at *2 (E.D.N.Y. Sept. 23, 2011), *R&R adopted*, 2012 WL 273078 (E.D.N.Y. Jan. 30, 2012).

## DISCUSSION

### I.      Procedural Compliance

To establish entitlement to default judgment, a plaintiff must demonstrate proper service of the summons and complaint. *See Advanced Cap. Com. Grp., Inc. v. Suarez*, No. 9-CV-5558 (DRH)(GRB), 2013 WL 5329254, at *2 (E.D.N.Y. Sept. 20, 2013).  An individual may be served according to the law of the state where service is made. Fed. R. Civ. P. 4(e)(1).  Likewise, a corporation may be served in the same manner for serving an individual as prescribed by Federal Rule of Civil Procedure 4(e)(1) or by delivering a copy of the summons and complaint to an officer appointed by law to receive such service. Fed. R. Civ. P. 4(h)(1).

Plaintiffs served Twin Kitty, Two Brothers, and Sweet Kiss by delivering and leaving a copy of the Summons and Complaint with the Secretary of State for New York.  (Dkts. 63-2, 63-3, 63-4.)  This is proper service on a domestic corporation in New York.  N.Y. Bus. Corp. L. § 306(b)(1); Fed. R. Civ. P. 4(h)(1)(B) (permitting service on "any other agent authorized by appointment or by law to receive service of process").  Plaintiffs personally served John Castro.  (Dkt. 63-5.)  N.Y. C.P.L.R. § 308(1); Fed. R. Civ. P. 4(e) (permitting service on an individual in accordance with the "state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located").  Plaintiffs served Jose Castro by delivering a copy of the Summons and Complaint to a person of suitable age at Jose's actual place of residence and then mailing a copy to Jose's residence.  (Dkt. 63-6.)  N.Y. C.P.L.R. § 308(2); Fed. R. Civ. P. 4(e).  Thus, Plaintiffs properly served the Defaulting Defendants.

As part of their Motion, Plaintiffs included a notice of motion (Dkt. 62, Local Civ. R. 7.1(a)(1)), a memorandum of law (Dkt. 64, Local Civ. R. 7.1(a)(2)), copies of the Clerk's certificate of default for each of the Defaulting Defendants (Dkts. 63-7, 63-8, 63-9, 63-10, 63-11, Local Civ. R. 55.2(b)(1)), a copy of the claim (Dkt. 63-1, Local Civ. R. 55.2(b)(2)), proof of service of the claim (Dkts. 63-2, 63-

3, 63-4, 63-5, 63-5, 63-6, Local Civ. R. 55.1(b)(3)), and a proposed judgment (Dkt. 63-18, Local Civ. R. 55.2(b)(3)). Plaintiffs also submitted proof that John Castro and Jose Castro are not on active military duty. (Dkt. 63 ¶ 9, Dkt. 63-12, Local Civ. R. 55.1(b)(1)). Although Plaintiffs did not submit proof of mailing the Motion to the Defaulting Defendants, they did submit proof of mailing the first and second default judgment motions. (Dkt. 59.) This is sufficient to satisfy Local Civil Rule 55.2(c).

Accordingly, Plaintiffs have complied with the procedural requirements for default judgment.

## II.   Subject Matter Jurisdiction

Jurisdiction over Plaintiffs' FLSA claims is proper pursuant to 28 U.S.C. § 1331, and jurisdiction over Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

## III.   Liability

### A.   *Whether the Defaulting Defendants Are an Integrated Enterprise or a Joint Employer*

Courts use two alternative tests to assess whether separate defendants acting in concert may be jointly liable for violations of labor laws. First, the single integrated enterprise test, which "assesses whether nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer." *Galicia v. Ice Cream House on Bedford Ave LLC*, No. 16-CV-6738 (CBA)(PK), 2017 WL 6733985, at *2 (E.D.N.Y. Oct. 17, 2017), *R&R adopted*, 2017 WL 6759299 (E.D.N.Y. Dec. 29, 2017) (quotation and citation omitted). Second, "[t]he joint employer test determines whether separate legal entities handle certain aspects of the employer-employee relationships jointly." *Id.* (quotation, citation, and alteration omitted).[8]

Under the single integrated enterprise test, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or

---

[8] These tests apply in both FLSA and NYLL cases. *See Galicia*, 2017 WL 6733985, at *1 (applying the single integrated enterprise test and the joint employer test in a case that alleged violations of both the FLSA and the NYLL).

financial control." *Apolinar v. R.J. 49 Rest., LLC*, No. 15-CV-8655 (KBF), 2016 WL 2903278, at \*4 (S.D.N.Y. May 18, 2016) (quotation and citation omitted).   The joint employer test employs the Second Circuit's "four-factor . . . 'economic reality' test." *Mendez v. Pure Foods Mgmt. Grp., Inc.*, No. 14-CV-1515 (SRU), 2016 WL 183473, at \*3 (D. Conn. Jan. 14, 2016).   The four-factor economic reality "test asks whether an employer: '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"   *Id.* (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).   No single "factor is dispositive or always necessary."   *Id.*

Although the exact relationship among Defendants is not clear, Plaintiffs provide sufficient allegations to conclude that both tests are satisfied.   Plaintiffs allege that Defendants collectively operated restaurants and bakeries at three different locations "as a joint or unified enterprise." (Compl. ¶¶ 2-3.)   These bakeries shared a common name: La Gata Golosa.   (*Id.* ¶ 2; *see also id.* ¶¶ 21-25.)   Defendants' labor relations were centralized; Plaintiffs were employees of all Defendants, and Defendants maintained common policies and practices with respect to their employees' work.   (*See id.* ¶¶ 4, 13, 34.)   "Each Defendant possessed substantial control over Plaintiffs' . . . working conditions, and over the policies and practices with respect to the employment and compensation of Plaintiffs." (*Id.* ¶ 33.)   "Defendants had the power to hire and fire Plaintiffs, controlled the terms and conditions of employment, and determined the rate and method of compensation in exchange for Plaintiffs' services."   (*Id.* ¶ 37.)

Further, the Individual Defendants collectively owned, managed, and controlled the functions of the Corporate Defendants.   (*Id.* ¶¶ 2, 26-29, 31.)   This control and management responsibility included the ability to set employee compensation, to establish employee schedules, to maintain records, and to hire and fire employees.   (*Id.* ¶¶ 26-29.)

Accordingly, the Defaulting Defendants are subject to joint liability for the purposes of Plaintiffs' labor law claims. *See Galicia*, 2017 WL 6733985, at *3.

## B.    Statutes of Limitations

The FLSA and the NYLL have different statutes of limitations.  Under the FLSA, the statute of limitations is two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  "When a defendant defaults, the violation is considered 'willful' and the three year statute of limitations applies." *Rodriguez v. Queens Convenience Deli Corp.*, No. 9-CV-1089 (KAM)(SMG), 2011 WL 4962397, at *2 (E.D.N.Y. Oct. 18, 2011) (citing *Blue v. Finest Guard Servs., Inc.*, No. 9-CV-133 (ARR), 2010 WL 2927398 (E.D.N.Y. June 24, 2010)).  "The statute of limitations starts to run when the employee begins to work for the employer." *Id.*  The NYLL's statute of limitations is six years.  N.Y. Lab. L. § 198(3).

Plaintiffs commenced this action on February 13, 2018 (Dkt. 1) and all Plaintiffs started working for Defendants before February 13, 2012. (*See* Saavedra Decl. ¶ 6; Alfaro Decl. ¶ 6; Montejo Decl. ¶ 6.)  Accordingly, all claims are timely under the NYLL.  However, because of the three-year statute of limitations, the FLSA does not apply prior to February 13, 2015.

## C.    Whether the FLSA Applies

The FLSA is to be "construed [ ] liberally" because its "broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (quotation and citations omitted).  To support a cause of action under the FLSA, Plaintiffs must establish that: (1) the Defaulting Defendants are "employer[s] subject to the FLSA"; (2) Plaintiffs are "'employee[s]' within the meaning of the FLSA"; and (3) "the employment relationship is not exempted from the FLSA." *Saucedo v. On the Spot Audio Corp.*, No. 16-CV-451 (CBA)(CLP), 2016 WL

8376837, at *4 (E.D.N.Y. Dec. 21, 2016), *R&R adopted*, 2017 WL 780799 (E.D.N.Y. Feb. 28, 2017),

*vacated on other grounds*, 2018 WL 4347791 (E.D.N.Y. Jan. 23, 2018) (citation omitted).

### 1.   Whether the Defaulting Defendants are Employers

Although the FLSA does not define the term "'employer' in the first instance," *Irizarry v.*

*Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013), it does broadly describe an employer as "any [person or

corporation] acting directly or indirectly in the interest of an employer in relation to an employee." 29

U.S.C. § 203(d).

"A single employee can have multiple employers under the FLSA, and an employer can be

held liable even if he was not personally complicit in FLSA violations." *Loo v. I.M.E. Rest., Inc.*, No.

17-CV-2558 (ARR)(RER), 2018 WL 4119234, at *4 (E.D.N.Y. Aug. 29, 2018) (quotation and citation

omitted). A defendant is an employer under FLSA if he or she meets the criteria for either enterprise

or individual coverage. *See Saucedo*, 2016 WL 8376837, at *4. The enterprise coverage test considers

whether the employer

> has employees engaged in commerce or in the production of goods for commerce, or
> . . . has employees handling, selling, or otherwise working on goods or materials that
> have been moved in or produced for commerce by any person; and . . . whose annual
> gross volume of sales made or business done is not less than $500,000.

29 U.S.C. § 203(s)(1)(A)(i-ii); *see also Fermin v. Las Delicias Peruanas Rest. Inc.*, 93 F. Supp. 3d 19, 33

(E.D.N.Y. 2015). The individual coverage test takes into account "the employment actions of each"

plaintiff to determine whether "the employees themselves are 'engaged in commerce.'" *Saucedo*, 2016

WL 8376837, at *4. "Commerce" is "trade, commerce, transportation, transmission, or

communication among the several States or between any State and any place outside thereof." 29

U.S.C. § 203(b).

The Complaint alleges that "[i]n each year from 2012 to 2017, Defendants, both separately

and jointly, had a gross annual volume of sales of not less than $500,000." (Compl. ¶ 38.) Plaintiffs

also allege that "Defendants and/or their enterprise were directly engaged in interstate commerce."

(*Id.* ¶ 39; *see also id.* ¶ 154 ("At all times relevant to this action, Defendants were engaged in commerce or in an industry or activity affecting commerce.").)  Further, each Plaintiff "regularly handled goods in interstate commerce."  (*Id.* ¶ 46 (Saavedra), ¶ 74 (Alfaro), ¶ 100 (Montejo).).  Although these allegations merely repeat the statutory elements, they are sufficient.  *Huerta v. Victoria Bakery*, No. 10-CV-4754 (RJD)(JO), 2012 WL 1107655, *2 (E.D.N.Y. Mar. 30, 2012) (court can "infer[ ] the requisite interstate commerce connection under [a] sensible approach").  Given the bakeries' annual sales, it can be inferred that some of the materials used to make the food and baked goods sold by Defendants originated in interstate commerce.  *Id.*  Accordingly, the Defaulting Defendants are employers within the meaning of the FLSA because both the enterprise and the individual coverage tests are satisfied.  *See Fermin*, 93 F. Supp. 3d at 33 (concluding that defendant "restaurant with an eat-in dining area and over $500,000 in annual sales" was an employer within the meaning of the FLSA because it was reasonable to infer that not all of its sales came exclusively from New York, and that some of the goods used to operate the restaurant "moved or were produced in interstate commerce").

### 2.    Whether Plaintiffs Are Employees

The FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  In addition to the allegations in the Complaint (*see* Compl. ¶¶ 1, 5, 42-43, 70-71, 96-97), Plaintiffs provide sworn statements that Defendants employed them as waitresses and cashiers. (Saavedra Decl. ¶¶ 6-7; Alfaro Decl. ¶¶ 6-7; Montejo Decl. ¶¶ 6-7.)  Plaintiffs thus fall within the FLSA's statutory definition of "employee."

### 3.    Whether the Employment Relationship Is Exempted from the FLSA

"Section 13 of the FLSA contains a litany of exemptions to the minimum wage requirement." *Chen v. Major League Baseball*, 6 F. Supp. 3d 449, 454 (S.D.N.Y. 2014).  For example, "bona fide 'professional' employees, a group that includes employees compensated on a salary basis at a rate of not less than $455.00 per week and whose primary duties require advance knowledge in a field of

science or learning" are not covered by the FLSA. *Ghosh v. Neurological Servs. of Queens*, No. 13-CV-1113 (ILG)(CLP), 2015 WL 431807, at *3 (E.D.N.Y. Feb. 3, 2015) (quoting 29 U.S.C. § 213(a)(1)). An employee's "exempt status depends less on his title, and more on the actual duties performed." *McBeth v. Gabrielli Trucks Sales, Ltd.*, 768 F. Supp. 2d 383, 387 (E.D.N.Y. 2010).

Plaintiffs were employed as waitresses and cashiers, and also performed various "non-tipped" duties such as cleaning the restaurants' facilities, cooking, preparing food, organizing merchandise, and taking out the trash. (Compl. ¶ 6.) Thus, they were not exempt from the FLSA's coverage. *See Fermin*, 93 F. Supp. 3d at 32 (explaining that jobs such as "waiter, kitchen helper/food preparer, cook and dishwasher all constitute non-exempt employment under the FLSA").

### D.   *Whether the NYLL Applies*

"To recover under the NYLL, plaintiff must prove that he was an 'employee' and that the defendant is an 'employer' as defined by the statute." *Garcia v. Badyna*, No. 13-CV-4021 (RRM)(CLP), 2014 WL 4728287, at *6 (E.D.N.Y. Sept. 23, 2014). "Unlike the FLSA, the NYLL does not require that a defendant achieve a certain minimum in annual sales or business in order to be subject to the law." *Id.* The NYLL broadly defines an employee as "any individual employed or permitted to work by an employer in any occupation." N.Y. Lab. L. § 651(5). Although the test for whether a plaintiff is an employee under the NYLL is "substantially similar to the FLSA," the New York test "focuses more on the degree of control exercised by the purported employer, as opposed to the economic reality of the situation." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013) (quotations and citation omitted). In other words, "'the critical inquiry in determining whether an employment relationship exists [under the NYLL] pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.'" *Id.* (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (N.Y. 2003)). As set forth above, Defendants exercised

19

control over the terms of Plaintiffs' employment. Therefore, Plaintiffs have established that they were employees.

Because the NYLL's definition of "employer" is coextensive with the FLSA's definition, *Fermin*, 93 F. Supp. 3d at 37, the Defaulting Defendants are employers within the meaning of the NYLL, and the NYLL applies to the instant dispute.

### E.    *Plaintiffs' Minimum Wage Claims*

#### 1.    **Applicable Minimum Wage Rates**

Under both the FLSA and the NYLL, employees must be paid at least the minimum hourly wage for each hour that they work. 29 U.S.C. § 206; N.Y. Lab. L. § 652. "The federal minimum wage does not preempt the state minimum wage, and a plaintiff may recover under whatever statute provides the highest measure of damages." *Wicaksono v. XYZ 48 Corp.*, No. 10-CV-3635 (LAK)(JCF), 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), *R&R adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011); *see also* 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter . . . .").

Both the FLSA and the NYLL allow for a "tip credit," *i.e.*, employers may "subtract some portion of the tips their employees receive from the amount [the employees] are owed under minimum wage laws . . . provided that the total amount received by the employee is equal to or in excess of the statutory minimum wage." *Wicaksono*, 2011 WL 2022644, at *4 (citing 29 U.S.C. § 203(m), N.Y. Lab. L. § 652(4)). A tip credit is proper under the FLSA when two conditions are satisfied. First, the employer must "inform the employee of the tip credit provision of the FLSA." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011) (quotation and citations omitted). Second, the employer must "permit the employee to retain all of the tips the employee receives." *Id.* (quotation

and citations omitted).  These two conditions are "strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Id.* (quotation and citation omitted).

The NYLL also imposes requirements for employers to take a tip credit on the law's minimum wage requirements.  Employers must provide a written notice that complies with New York's regulations.  *See Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 498 (S.D.N.Y. 2015).  These requirements include "notice of the employee's regular hourly pay rate, overtime rate, the amount of the tip credit, if any, . . . and the regular payday."  N.Y. Comp. Codes R. & Regs. tit. 12 § 146-2.2(a). The notice, which must be given to the employee prior to the start of employment and "prior to any change in the employee's hourly rates of pay," is to be in English and the employee's primary language. *Id.* § 146-2.2(a)-(b).  "In addition to the notice, state records also impose a recordkeeping burden, by requiring that an employer 'establish, maintain and preserve for at least six years weekly payroll records' that show the 'tip credits, if any, claimed as part of the minimum wage.'"  *Inclan*, 95 F. Supp. 3d at 498 (quoting N.Y. Comp. Codes R. & Regs. tit. 12 § 146-2.1(a)(9)).

Neither the FLSA nor the NYLL tip credit conditions have been satisfied.  Plaintiffs never received any notifications—in either English or Spanish, their primary language—that conformed to the requirements of the FLSA or the NYLL.  Defendants also did not post any such notifications in the restaurants.  (*See* Compl. ¶¶ 61, 66, 68, 87, 92, 94, 116, 143, 148.)  "Defendants failed to inform Plaintiffs who received tips that Defendants intended to take a deduction against Plaintiffs' earned wages for tip income . . . ."  (*Id.* ¶ 137; *see also id.* ¶ 138.)  They also did not maintain accurate and complete timesheet and payroll records. (*See id.* ¶¶ 8, 129, 139, 141.)  Accordingly, the minimum wage against which Plaintiffs' hourly compensation must be measured is the full rate set forth by federal and state law.  *See Inclan*, 95 F. Supp. 3d at 498 (holding that defendants could not avail themselves of either the FLSA or NYLL tip credits because they failed to comply with both laws' notice requirements).

Saavedra started working for Defendants the earliest, in May 2012.  (Compl. ¶ 18.)  All three

Plaintiffs stopped working for Defendants in September 2017.  (*Id.* ¶¶ 18-20.)  The federal minimum

wage has remained at $7.25 throughout this period.  *See* U.S. Dep't of Labor, *History of Federal Minimum*

*Wage      Rates      Under      the      Fair      Labor      Standards      Act,      1938-2009*,

https://www.dol.gov/agencies/whd/minimum-wage/history/chart  (last  visited  Nov.  19,  2020).

However, as detailed in the chart below, the New York minimum wage has changed.[9]

| Start Date | End Date | Minimum Wage |
|---|---|---|
| January 1, 2007 | December 30, 2013 | $7.15 |
| December 31, 2013 | December 30, 2014 | $8.00 |
| December 31, 2014 | December 30, 2015 | $8.75 |
| December 31, 2015 | December 30, 2016 | $9.00 |
| December 31, 2016 | December 30, 2017 | $11.00[10] |

Although the federal minimum wage was higher than the New York minimum wage from May

2012 until December 30, 2013, it does not apply to Plaintiffs' claims because of the FLSA's statute of

limitations.  Accordingly, the New York rates are the applicable minimum wages for all of Plaintiffs'

claims.

### 2.    Whether Plaintiffs Were Paid the Minimum Wage

The  Defaulting  Defendants  are  subject  to  New  York's  Hospitality  Industry  Wage  Order

("Order").  *See generally* N.Y. Comp. Codes R. & Regs. tit. 12 Part 146.[11]  As "employees" within the

---

[9] The information in the New York minimum wage chart is from NYLL § 652(1).  In the Memorandum, Plaintiffs suggest that New York City's minimum wages as of December 31, 2017 and December 31, 2018 should apply to this action.  (Memo. at 8-9.)  However, all Plaintiffs ceased working for Defendants by the end of September 2017.  (Compl. ¶¶ 18-20.)

[10] Plaintiffs provide no allegations as to how many employees worked for Defendants.  However, they use the $11.00 per hour minimum wage applicable to "large employers"—defined as "[e]very employer of eleven or more employees," N.Y. Lab. L. § 652(1)(a)(i)—in their damages calculations.  (*See* Dkt. 63-16.)  Given Plaintiffs' allegations that the Individual Defendants owned multiple restaurants that acted as a joint enterprise, it can be inferred that Defendants employed at least eleven people.

[11] The Order applies to "[e]very employer in the hospitality industry," which "includes any restaurant" defined as "any eating or drinking place that prepares and offers food or beverage for human consumption either on

meaning of the Order,[12] Defendants were required to pay Plaintiffs hourly rates of pay. *Id.* § 146-2.5. Because Defendants paid Plaintiffs by shift and not by the hour, the Order requires that "the employee's regular hourly rate of pay [ ] be calculated by dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." *Id.* § 146-3.5.

Plaintiffs worked shifts that were typically eight or nine hours long. In their declarations, each Plaintiff provided the approximate number of shifts they worked per week and the start and stop time of each shift. These numbers varied during different time periods. Plaintiffs were paid on a per shift basis. The amount of pay Plaintiffs received also varied by time period.

To calculate the regular hourly rate of pay, the undersigned multiplied the pay per shift by the number of shifts per week.[13] This resulted in the pay per week each Plaintiff received. To obtain the regular hourly rate, the pay per week was divided by the lesser of (1) the number of hours each Plaintiff worked per week, or (2) forty. The regular hourly rate was then compared to the applicable minimum wage to determine whether Plaintiffs were properly compensated. *See Long Lin v. New Fresca Tortilla, Inc.*, No. 18-CV-3246 (RJD)(RER), 2019 WL 3716199, at *3 (E.D.N.Y. May 1, 2019), *R&R adopted*, 2019 WL 3714600 (E.D.N.Y. May 28, 2019).[14]

---

any of its premises or by such service as catering, banquet, box lunch, curb service or counter service to the public." N.Y. Comp. Codes R. Regs. tit. 12 §§ 146-1.1(a), 146-3.1(a), 146-3.1(b).

[12] Subject to a few limited exceptions not applicable here, the Order defines "employee" as "any individual suffered or permitted to work in the hospitality industry by the operator of the establishment or by any other employer." N.Y. Comp. Codes R. Regs. tit. 12 § 146-.32(a).

[13] For those periods in which Plaintiffs worked a variable number of shifts or hours per week, an average was used. The undersigned also had to make a number of assumptions in order to determine whether Plaintiffs were paid the applicable minimum wage and to calculate the damages owed to Plaintiffs. Because the time periods set forth in the factual declarations overlapped, the assumptions include fixing beginning and end dates for each period.

[14] Plaintiffs provide a purported "counsel's excel computation of the damages owed to Plaintiffs based upon their declaration testimony." (Dkt. 63 ¶ 13.) However, this spreadsheet has a number of mistakes in it. For example, it states that the applicable minimum wage before December 31, 2013 was $7.25. (Dkt. 63-16.) As

a.     *Saavedra*

Because Saavedra always worked more than forty hours per week, her regular hourly rate of pay was calculated using a forty-hour work week.  Based on the calculations set forth below,[15] Saavedra was not paid the applicable minimum wage from May 1, 2012 to December 31, 2012 and from January 1, 2014 to September 13, 2017.

| Time Period | Pay Per Shift | Avg. Shifts Per Week | Weekly Pay (pay per shift x avg shifts per wk) | Avg. Hours Per Week | Regular Hourly Rate | Minimum Wage |
|---|---|---|---|---|---|---|
| May 1, 2012 – Dec. 31, 2012 | $42.00 | 6.5 | $273.00 | 52 | $6.83 | $7.15 |
| March 1, 2013 – Dec. 31, 2013 | $48.00 | 6 | $288.00 | 48 | $7.20 | $7.15 |
| Jan. 1, 2014 – Dec. 30, 2014 | $52.00 | 5.5 | $286.00 | 44 | $7.15 | $8.00 |
| Dec. 31, 2014 – Dec. 30, 2015 | $60.00 | 5.5 | $330.00 | 44 | $8.25 | $8.75 |
| Dec. 31, 2015 – Dec. 30, 2016 | $60.00 | 5.5 | $330.00 | 44 | $8.25 | $9.00 |
| Dec. 31, 2016 – March 31, 2017 | $70.00 | 5.5 | $385.00 | 44 | $9.62 | $11.00 |
| April 1, 2017 – Sept. 13, 2017 | $60.00 | 5.5 | $330.00 | 44 | $8.25 | $11.00 |

b.     *Alfaro*

Alfaro either worked forty hours or less throughout the course of her employment.  (*See* Alfaro Decl. ¶¶ 9-11.)  Accordingly, her actual number of hours worked per week was used in calculating the regular hourly rate.  Based on the calculations set forth below,[16] Alfaro was not paid the operative minimum wage throughout her employment.

---

set forth above, this is incorrect.  The spreadsheet also calculates how much overtime Alfaro is owed even though she never worked over forty hours a week.  (*Id.*)  Accordingly, the undersigned used the spreadsheet as a reference but did not rely on it.

[15] The information in this table is drawn from paragraphs 9-17 of the Saavedra Declaration.

[16] The information in this table is drawn from paragraphs 9-16 of the Alfaro Declaration.

| Time Period | Pay Per Shift | Avg. Shifts Per Week | Weekly Pay (pay per shift *x* avg shifts per wk) | Avg. Hours Per Week | Regular Hourly Rate | Minimum Wage |
|---|---|---|---|---|---|---|
| Feb. 1, 2013 – Dec. 30, 2013 | $48.00 | 5 | $240.00 | 40 | $6.00 | $7.15 |
| Dec. 31, 2013 – Feb. 28, 2014 | $48.00 | 5 | $240.00 | 40 | $6.00 | $8.00 |
| March 1, 2014 – Dec. 30, 2014 | $52.00 | 5 | $260.00 | 40 | $6.50 | $8.00 |
| Dec. 31, 2014 – Dec. 31, 2015 | $60.00 | 5 | $300.00 | 40 | $7.50 | $8.75 |
| Jan. 1, 2016 – Sept. 30, 2016 | $60.00 | 4 | $240.00 | 32 | $7.50 | $9.00 |
| Oct. 1, 2016 – Dec. 30, 2016 | $60.00 | 4.5 | $270.00 | 36 | $7.50 | $9.00 |
| Dec. 31, 2016 – Feb. 28, 2017 | $70.00 | 4.5 | $315.00 | 36 | $8.75 | $11.00 |
| March 1, 2017 – Sept. 13, 2017[17] | $60.00 | 4.5 | $270.00 | 36 | $7.50 | $11.00 |

### c.  *Montejo*

Because Montejo worked more than forty hours per week prior to January 1, 2016, her regular rate of pay for this period was calculated using forty hours per week.  Because she worked less than forty hours per week starting on January 1, 2016, her regular rate of pay for this period was calculated using the average number of hours per week that she worked.  (*See* Montejo Decl. ¶¶ 9-13.)

Based on the calculations set forth below,[18] Montejo was paid above the minimum wage from June 1, 2013 until December 30, 2013.  She was paid below minimum wage from December 31, 2013 to September 13, 2017.

---

[17] Alfaro did not state the day in September on which she stopped working for Defendants.  Because the other Plaintiffs stopped working on September 13, 2017, it is assumed that Alfaro also stopped working on September 13.

[18] The information in this table is drawn from paragraphs 9-18 of the Montejo Declaration.

| Time Period | Pay Per Shift | Avg. Shifts Per Week | Weekly Pay (pay per shift *x* avg shifts per wk) | Avg. Hours Per Week | Regular Hourly Rate | Minimum Wage |
|---|---|---|---|---|---|---|
| June 1, 2013 – August 31, 2013 | $48.00 | 7 | $336.00 | 59.5 | $8.40 | $7.15 |
| Sept. 1, 2013 – Dec. 30, 2013 | $48.00 | 6 | $288.00 | 54 | $7.20 | $7.15 |
| Dec. 31, 2013 – June 30, 2014 | $52.00 | 6 | $312.00 | 54 | $7.80 | $8.00 |
| July 1, 2014 – Dec. 30, 2014 | $52.00 | 5 | $260.00 | 45 | $6.50 | $8.00 |
| Dec. 31, 2014 – Dec. 31, 2015 | $60.00 | 5 | $300.00 | 45 | $7.50 | $8.75 |
| Jan. 1, 2016 – Dec. 30, 2016 | $60.00 | 4 | $240.00 | 36 | $6.67 | $9.00 |
| Dec. 31, 2016 – Feb. 28, 2017 | $70.00 | 4 | $280.00 | 36 | $7.78 | $9.00 |
| March 1, 2017 – April 30, 2017 | $60.00 | 4 | $240.00 | 36 | $6.67 | $11.00 |
| May 1, 2017 – Sept. 13, 2017 | $60.00 | 2.5 | $150.00 | 20 | $6.67 | $11.00 |

\*     \*     \*

Accordingly, the undersigned finds that Defaulting Defendants did not pay Plaintiffs the New York minimum wage during the following periods: Saavedra was not paid the applicable minimum wage from May 1, 2012 to December 31, 2012 and from January 1, 2014 to September 13, 2017; Alfaro was not paid the applicable minimum wage from February 1, 2013 to September 13, 2017; and Montejo was not paid the applicable minimum wage from December 31, 2013 to September 13, 2017.

F.    *Plaintiffs' Overtime Claims*

Each Plaintiff claims that she was not paid overtime when she worked more than forty hours a week.  (*See* Saavedra Decl. ¶¶ 8, 18; Alfaro Decl. ¶¶ 8, 17; Montejo Decl. ¶¶ 8, 19.)  "The FLSA mandates that [a covered employee] be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week . . . ."  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) (citing 29 U.S.C. § 207(a)) (footnote omitted).  "[T]he NYLL adopts this same standard."  *Id.* (citing N.Y.C.R.R. § 142-2.2.)  Although there

is not "an all-purpose pleading template [for] alleging overtime," plaintiffs must "provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 90 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Saavedra alleges that from May 2012 until December 2012, she "typically" worked "48 to 56 hours per week" (Saavedra Decl. ¶ 9) and from March 2013 until January 2014, she "typically" worked "48 hours per week" (*id.* ¶ 10). Because she was not paid overtime for her work in excess of forty hours during these two periods, she is entitled to overtime. *See Tackie v. Keff Enters. LLC*, No. 14-CV-2074 (JPO), 2014 WL 4626229, at *3 (S.D.N.Y. Sept. 16, 2014) (holding that plaintiff stated a claim for failure to pay overtime when she "alleged that she worked a fairly regular schedule of forty hours per week, and she occasionally worked more than forty hours per week, yet she was paid only sporadically").

From January 2014 until September 13, 2017, Saavedra "typically" worked "40 to 48 hours per week." (Saavedra Decl. ¶ 11.) Because she provides only an approximation of the hours worked, the calculation of her hours will be based on the midpoint number, *see Khurana v. JMP USA, Inc.*, No. 14-CV-4448 (SIL), 2017 WL 1251102, at *15 (E.D.N.Y. Apr. 5, 2017) (using the average weekly hours plaintiff worked to calculate whether plaintiff was entitled to overtime), *i.e.*, 44 hours per week from January 2014 until September 13, 2017 and is thus entitled to overtime compensation.

Alfaro alleges that she "typically" worked "40 hours per week" from February 2013 until January 2016, "32 hours per week" from January 2016 until October 2016, and "32 to 40 hours per week" from October 2016 until September 2017. (Alfaro Decl. ¶¶ 9-11.) Because these numbers do not indicate that she ever worked more than 40 hours a week, she is not entitled to any overtime compensation.

Montejo alleges that from June 2013 until August 2013, she "typically" worked "56 to 63 hours per week," from September 2013 until June 2014, she "typically" worked "54 hours per week," and

from July 2014 until December 2015, she "typically" worked "45 hours per week." (Montejo Decl. ¶¶ 9-11.) Therefore, she is entitled to overtime pay during these three periods. However, from January 2016 until May 2017, she "typically" worked "36 hours per week" and from May 2017 until September 13, 2017, she "typically" worked "18 to 27 hours per week." (*Id.* ¶¶ 12-13.) Because she did not work over forty hours per week during these periods, Montejo is not entitled to overtime pay from January 2016 to September 13, 2017.[19]

Accordingly, the undersigned finds that Saavedra is entitled to overtime pay for her full period of employment, that Montejo is entitled to overtime pay until December 31, 2015, and that Alfaro is not entitled to any overtime pay.

### G. *Wage Notice Claims*

NYLL § 195(1)(a) first took effect on April 9, 2011. *Guaman v. Krill Contracting, Inc.*, No. 14-CV-4242 (FB)(RER), 2015 WL 3620364, at *8 (E.D.N.Y. June 9, 2015). At the time, it required every employer to "provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, and on or before February first of each subsequent year of the employee's employment with the employer, a notice containing" certain information. 2010 Sess. L. News of N.Y. Ch. 564 (S. 8380).

Although the New York Legislature amended § 195(1)(a) on December 29, 2014, *see* 2014 Sess. L. News of N.Y. Ch. 537 (A. 8106-C), the original version of the law applies because Plaintiffs all started working for the Defaulting Defendants after April 9, 2011 but before December 29, 2014. (*See* Compl. ¶ 18 (Saavedra started working in May 2012), ¶ 19 (Alfaro started working in February 2013), ¶ 20 (Montejo started working in June 2013).)

---

[19] In addition to calculating Alfaro's overtime compensation, Plaintiffs' counsel calculates overtime pay for Montejo from January 2016 until September 2017 even though she did not work more than forty hours per week after December 2015. (*See* Dkt. 63-16.)

Section 198(1-b) provides employees who did not receive their wage notices a right of action against their employers.  Specifically, it states, "[i]f any employee is not provided within ten business days of his or her first day of employment a notice as required by [§ 195(1)], he or she may recover in a civil action damages of fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."[20]

Plaintiffs allege that they never received wage notices within ten days after the start of their employment.  (*See* Compl. ¶¶ 66, 68, 92, 94, 121, 123.)  Thus, Plaintiffs have stated claims for breach of NYLL § 195(1)(a).

### H.   Wage Statement Claims

NYLL § 195(3) requires "[e]very employer" to "furnish each employee with a statement with every payment of wages."  The statement must include: (1) the pay period's dates; (2) the name of the employer and its address and phone number; (3) the employee's rate of pay and how it is calculated; (4) gross wages, net wages, deductions, and claimed allowances; (5) wage supplements; (6) the employee's rate of pay and overtime rate or rates of pay; and (7) the number of hours worked at the employee's regular rate and the number of hours worked at the overtime rate(s).  *See id.*

Plaintiffs allege that they never received wage statements while working for Defendants.  (*See* Compl. ¶¶ 62, 67, 88, 93, 117, 122.)  Thus, Plaintiffs have stated claims for breach of NYLL § 195(3).

## IV.   Damages

### A.   Minimum Wage

---

[20] The New York Legislature added § 198(1-b) when it added § 195(1)(a).  *See* 2010 Sess. L. News of N.Y. Ch. 664 (S. 8380).  Although the Legislature amended § 198(1-b) in 2014, at the same time that it amended § 195(1)(a), the first clause—"[i]f any employee is not provided within ten business days of his or her first day of employment a notice as required by [§ 195(1)], he or she may recover in a civil action damages"—remained the same.

The minimum wage shortfall for each Plaintiff was calculated in three steps.  First, the weekly wage Plaintiffs should have received, had they been paid at minimum wage, was calculated.  Because overtime is calculated separately, the applicable minimum wage for each period was multiplied by the lesser of (1) forty, or (2) the average number of hours per week each Plaintiff worked.  Second, the weekly shortfall was determined by subtracting the weekly wage owed from the weekly wage actually paid (which was calculated above).  Third, the minimum wage shortfall was calculated on a period wide basis by multiplying the weekly shortfall by the number of weeks in a given period.

| *Saavedra*[21] | | | | | |
|---|---|---|---|---|---|
| Time Period | No. of Weeks | Weekly Wage Owed | Weekly Wage Paid | Weekly Shortfall (weekly wage owed – weekly wage paid) | Shortfall for Period (weekly shortfall *x* no. of wks) |
| May 1, 2012 – Dec. 31, 2012 | 35 | $286.00 ($7.15 *x* 40) | $273.00 | $13.00 | $455.00 |
| Jan. 1, 2014 – Dec. 30, 2014 | 52 | $320.00 ($8.00 *x* 40) | $286.00 | $34.00 | $1,768.00 |
| Dec. 31, 2014 – Dec. 30, 2015 | 52 | $350.00 ($8.75 *x* 40) | $330.00 | $20.00 | $1,040.00 |
| Dec. 31, 2015 – Dec. 30, 2016 | 52 | $360.00 ($9.00 *x* 40) | $330.00 | $30.00 | $1,560.00 |
| Dec. 31, 2016 – March 31, 2017 | 13 | $440.00 ($11.00 *x* 40) | $385.00 | $55.00 | $715.00 |
| April 1, 2017 – Sept. 13, 2017 | 24 | $440.00 ($11.00 *x* 40) | $330.00 | $110.00 | $2,640.00 |
| *Total Minimum Wage Shortfall* | | | | | *$8,178.00* |

---

[21] Information in this table is derived from paragraphs 9-17 of the Saavedra Declaration.

| | | | | | *Alfaro*[22] | |
|---|---|---|---|---|---|---|
| Time Period | No. of Weeks | Weekly Wage Owed | Weekly Wage Paid | Weekly Shortfall (weekly wage owed – weekly wage paid) | Shortfall for Period (weekly shortfall *x* no. of wks) |
| Feb. 1, 2013 – Dec. 30, 2013 | 47 | $286.00 ($7.15 *x* 40) | $240.00 | $46.00 | $2,162.00 |
| Dec. 31, 2013 – Feb. 28, 2014 | 8 | $320.00 ($8.00 *x* 40) | $240.00 | $80.00 | $640.00 |
| March 1, 2014 – Dec. 30, 2014 | 43 | $320.00 ($8.00 *x* 40) | $260.00 | $60.00 | $2,580.00 |
| Dec. 31, 2014 – Dec. 31, 2015 | 52 | $350.00 ($8.75 *x* 40) | $300.00 | $50.00 | $2,600.00 |
| Jan. 1, 2016 – Sept. 30, 2016 | 39 | $288.00 ($9.00 *x* 32) | $240.00 | $48.00 | $1,872.00 |
| Oct. 1, 2016 – Dec. 30, 2016 | 13 | $324.00 ($9.00 *x* 36) | $270.00 | $54.00 | $702.00 |
| Dec. 31, 2016 – Feb. 28, 2017 | 8 | $396.00 ($11.00 *x* 36) | $315.00 | $81.00 | $648.00 |
| March 1, 2017 – Sept. 13, 2017 | 28 | $396.00 ($11.00 *x* 36) | $270.00 | $126.00 | $3,528.00 |
| *Total Minimum Wage Shortfall* | | | | | **$14,732.00** |

| | | | | | *Montejo*[23] | |
|---|---|---|---|---|---|---|
| Time Period | No. of Weeks | Weekly Wage Owed (min. wage x hrs/wk) | Weekly Wage Paid (shifts/wk x pay/shift) | Weekly Shortfall (weekly wage owed – weekly wage paid) | Shortfall for Period (weekly shortfall x no. of wks) |
| Dec. 31, 2013 – June 30, 2014 | 26 | $320.00 ($8.00 *x* 40) | $312.00 | $8.00 | $208.00 |
| July 1, 2014 – Dec. 30, 2014 | 26 | $320.00 ($8.00 *x* 40) | $260.00 | $60.00 | $1,560.00 |
| Dec. 31, 2014 – Dec. 31, 2015 | 52 | $350.00 ($8.75 *x* 40) | $300.00 | $50.00 | $2,600.00 |
| Jan. 1, 2016 – Dec. 30, 2016 | 52 | $324.00 ($9.00 *x* 36) | $240.00 | $84.00 | $4,368.00 |
| Dec. 31, 2016 – Feb. 28, 2017 | 8 | $324.00 ($9.00 *x* 36) | $280.00 | $44.00 | $352.00 |

---

[22] Information in this table is derived from paragraphs 9-16 of the Alfaro Declaration.

[23] Information in this table is derived from paragraphs 9-18 of the Montejo Declaration.

| | | | | | |
|---|---|---|---|---|---|
| March 1, 2017 – April 30, 2017 | 9 | $396.00 ($11.00 x 36) | $240.00 | $156.00 | $1404.00 |
| May 1, 2017 – Sept. 13, 2017 | 19 | $247.50 ($11.00 x 22.5) | $150.00 | $70.00 | $1,330.00 |
| *Total Minimum Wage Shortfall* | | | | | *$11,822.00* |

Accordingly, the undersigned respectfully recommends that Saavedra be awarded $8,178.00, Alfaro be awarded $14,732.00, and Montejo be awarded $11,822.00 in minimum wages due.

**B.    *Overtime***

Only Saavedra and Montejo are entitled to overtime compensation.  For those periods in which they earned below the minimum wage, their overtime compensation is calculated at 150% of the minimum wage.  For those periods in which they earned above the minimum wage, their overtime is calculated at 150% of the hourly wage they earned during that period.  *See Gunawan*, 897 F. Supp. 2d at 90 (using the minimum wage to calculate plaintiff's overtime damages where plaintiff's compensation was below the minimum wage).

To calculate the amount of overtime owed to Saavedra and Montejo, the number of hours exceeding forty that each Plaintiff worked per week is multiplied by 150% of the higher of (1) the applicable minimum wage, or (2) Plaintiff's hourly rate of compensation, resulting in the amount of overtime compensation owed to each Plaintiff on a weekly basis.  To obtain the total overtime compensation owed for each time period, this per week figure is multiplied by the number of weeks in that time period.

The following tables set forth the calculations to determine the overtime wages owed to Saavedra and Montejo.

| *Saavedra*[24] | | | | | |
|---|---|---|---|---|---|
| **Time Period** | **Weeks Per Period** | **Hours Per Week Over 40** | **150% of Applicable Wage** | **Overtime Per Week** | **Overtime Per Period** |
| May 1, 2012 – Dec. 31, 2012 | 35 | 12 | $10.73 | $128.70 | $4,504.50 |
| March 1, 2013 – Dec. 13, 2013 | 44 | 8 | $10.80 | $86.40 | $3,801.60 |
| Jan. 1, 2014 – Dec. 30, 2014 | 52 | 4 | $12.00 | $48.00 | $2,496.00 |
| Dec. 31, 2014 – Dec. 30, 2015 | 52 | 4 | $13.13 | $52.50 | $2,730.00 |
| Dec. 31, 2015 – Dec. 30, 2016 | 52 | 4 | $13.50 | $54.00 | $2,808.00 |
| Dec. 31, 2016 – March 31, 2017 | 13 | 4 | $16.50 | $66.00 | $858.00 |
| April 1, 2017 – Sept. 13, 2017 | 24 | 4 | $16.50 | $66.00 | $1,584.00 |
| *Total Overtime Owed* | | | | | *$18,782.10* |

| *Montejo*[25] | | | | | |
|---|---|---|---|---|---|
| **Time Period** | **Weeks Per Period** | **Hours Per Week Over 40** | **150% of Applicable Wage** | **Overtime Per Week** | **Overtime Per Period** |
| June 1, 2013 – August 31, 2013 | 13 | 19.5 | $12.60 | $245.70 | $3,194.10 |
| Sept. 1, 2013 – Dec. 30, 2013 | 17 | 14 | $10.80 | $151.20 | $2,570.40 |
| Dec. 31, 2013 – June 30, 2014 | 26 | 14 | $12.00 | $168.00 | $4,368.00 |
| July 1, 2014 – Dec. 30, 2014 | 26 | 5 | $12.00 | $60.00 | $1,560.00 |
| Dec. 31, 2014 – Dec. 31, 2015 | 52 | 5 | $13.13 | $65.63 | $3,412.50 |
| *Total Overtime Owed* | | | | | *$15,105.00* |

Accordingly, the undersigned respectfully recommends that Saavedra be awarded $18,782.10 and Montejo be awarded $15,105.00 in overtime wages.

---

[24] Information in this table is derived from paragraphs 9-17 of the Saavedra Declaration.

[25] Information in this table is derived from paragraphs 9-18 of the Montejo Declaration.

C.    *Wage Notices*

As stated above, the NYLL requires employees to be provided with a written notice within the first ten business days of the start of employment.  If the employees do not receive this notice, they can recover damages of $50 for each workday that they do not receive the notice.  However, these damages cannot exceed $5,000 per employee.  *See* N.Y. Lab. L. § 198(1-b).

Plaintiffs each worked for Defendants for more than the 100 days that would yield $5,000.  Therefore, each Plaintiff is entitled to the maximum award of $5,000.

D.    *Wage Statements*

NYLL § 198(1-d) states that an employee who "is not provided a statement or statements as required by [§ 195(3)] may recover in a civil action damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars."  Plaintiffs each worked for Defendants for more than the twenty days that would yield $5,000.  Therefore, each Plaintiff is entitled to the maximum award of $5,000.

E.    *Liquidated Damages*

Plaintiffs seek "liquidated damages of 100% on [their] unpaid minimum and overtime wages under the NYLL." (Memo. at 10.)  Under the FLSA and the NYLL, an employee may be entitled to recover liquidated damages equal to the amount owed for unpaid minimum wage and overtime compensation.  29 U.S.C. § 216(b); N.Y. Lab. L. § 198(1-a).  If the employer shows that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA or NYLL, a court may decide not to award liquidated damages.  29 U.S.C. § 260; *see* N.Y. Lab. L. § 198(1-a).  Since the Defaulting Defendants did not respond to the Motion, there is no good faith and liquidated damages are appropriate.  *See Herrara*

*v. Tri-State Kitchen & Bath, Inc.*, No. 14-CV-1695 (ARR)(MDG), 2015 WL 1529653, at *12 (E.D.N.Y. Mar. 31, 2015) (defaulting defendants did not show good faith).

The Second Circuit has interpreted the NYLL to preclude the award of double liquidated damages—that is, liquidated damages under both the NYLL and FLSA. *See Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018). In light of the principle that "the law providing the greatest recovery will govern," Plaintiffs may be awarded pursuant to the NYLL or the FLSA. *Charvac v. M&T Project Managers of N.Y., Inc.*, No. 12-CV-5637 (CBA)(RER), 2015 WL 5475531, at *4 (E.D.N.Y. June 17, 2015) (citation omitted). Liquidated damages are not available for violations of the NYLL wage notice and statement provisions. *See* N.Y. Lab. L. § 198(1-a), (1-d).

Accordingly, the undersigned respectfully recommends that Plaintiffs be awarded liquidated damages in the following amounts: Saavedra $26,960.00; Alfaro $14,732.00; and Montejo $26,927.00.

## F.    *Prejudgment Interest*

"In any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover . . . prejudgment interest as required under the civil practice law and rules." N.Y. Lab. L. § 198(1-a). Since "liquidated damages and prejudgment interest are not functional equivalents under the NYLL, prevailing plaintiffs may recover both for claims brought under the NYLL." *Saucedo*, 2016 WL 8376837, at *16 (citation omitted). Prejudgment interest is not available for a plaintiff's liquidated damages or violations of the NYLL's wage notice or wage statement provisions. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 515 (S.D.N.Y. 2017).

The statutory interest rate in New York for prejudgment interest is nine percent per annum. N.Y. C.P.L.R. § 5004. Courts have discretion in determining a reasonable date from which to award prejudgment interest, such as "the earliest ascertainable date the cause of action existed," or a midway

point between when the plaintiff began and ended work if damages were incurred at various times. *See Santillan*, 822 F. Supp. 2d at 298 (citing N.Y. C.P.L.R. § 5001(b)).

Here, Plaintiffs request prejudgment interest but do not specify the dates from which the prejudgment interest should run. (Memo. at 10.) Because Plaintiffs were denied adequate wages throughout their employment, an intermediate date for each Plaintiff will be used. Saavedra worked for Defendants from May 1, 2012 until September 13, 2017. (Saavedra Decl. ¶ 6.)[26] The midpoint date is January 6, 2015. Alfaro worked for Defendants from February 1, 2013 until September 13, 2017. (Alfaro Decl. ¶ 6.) The midpoint date is May 24, 2015. Montejo worked for Defendants from June 1, 2013 until September 13, 2017. (Montejo Decl. ¶ 6.) The midpoint date is July 23, 2015.

Saavedra's combined minimum wage and overtime damages are $26,960.00. Prejudgment interest on these damages at a rate of nine percent per annum is $6.65 per day. Alfaro's minimum wage damages are $14,732.00. Prejudgment interest on these damages at a rate of nine percent per annum is $3.63 per day. Montejo's combined minimum wage and overtime damages are $26,927.00. Prejudgment interest on these damages at a rate of nine percent per annum is $6.64 per day.

Accordingly, the undersigned respectfully recommends that (1) Saavedra be awarded prejudgment interest in the amount of $6.65 per day from January 6, 2015 until the date of entry of judgment, (2) Alfaro be awarded prejudgment interest in the amount of $3.63 per day from May 24, 2015 until the date of entry of judgment, and (3) Montejo be awarded prejudgment interest in the amount of $6.64 per day from July 23, 2015 until the date of entry of judgment.

## G.    *Increased Judgment in the Event of Defendants' Failure to Pay*

NYLL § 663(4) states that "[a]ny judgment or court order awarding remedies under this section shall provide that if any amounts remain unpaid upon the expiration of ninety days following

---

[26]  In their declarations, Plaintiffs did not provide the day on which they started working for Defendants, just the month they started. (*See* Saavedra Decl. ¶ 6; Alfaro Decl. ¶ 6; Montejo Decl. ¶ 6.) For the purpose of calculating the midpoint dates, each Plaintiff is assumed to have started working on the first of the month.

issuance of judgment, or ninety days after expiration of the time to appeal and no appeal therefrom is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent." Pursuant to this provision, damages and prejudgment interest "automatically increase by fifteen percent" if they are not paid within ninety days of the entry of judgment. *Rosendo v. Everbrighten, Inc.*, No. 13-CV-7256 (JGK), 2015 WL 4557147, at *1 (S.D.N.Y. July 28, 2015).

Here, all of Plaintiffs' damages are attributable to the NYLL. The wage notice and wage statement claims arise solely under the NYLL and not the FLSA. Plaintiffs' pre-February 13, 2015 minimum wage and overtime claims also arise solely under the NYLL because of the FLSA's three-year statute of limitations. The remainder of Plaintiffs' minimum wage and overtime damages also arise under the NYLL as it was New York law that supplied the applicable minimum wage against which the wage paid by Defendants was measured.

## V.      Attorneys' Fees and Costs

Prevailing plaintiffs are allowed to recover reasonable attorneys' fees and costs under both the FLSA and the NYLL. *See* 29 U.S.C. § 216(b); N.Y. Lab. L. § 663(1). Here, Plaintiffs request $1,716.6 in attorneys' fees and $733.40 in costs. (Memo. at 11.)

### A.      *Attorneys' Fees*

District courts have broad discretion to determine the amount of attorneys' fees awarded, and the party requesting fees must submit documentation to support its request. *Mahoney v. Amekk Corp.*, No. 14-CV-4131 (ENV)(VMS), 2016 WL 6585810, at *18 (E.D.N.Y. Sept. 30, 2016), *R&R adopted*, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016). Courts must "us[e] their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of each component of a fee award." *Century 21 Real Estate LLC v. Bercosa Corp.*, 666 F. Supp. 2d 274, 298 (E.D.N.Y. 2009) (quotation and citation omitted).

The appropriate attorneys' fee is calculated by multiplying the number of hours reasonably spent by counsel on the matter by a reasonable hourly rate. *Saucedo*, 2016 WL 8376837, at *17. This "lodestar method" may be adjusted based on the circumstances of the case. *Id.* Courts determine what constitutes a reasonable hourly rate through application of "the forum rule," which states that "courts should generally use the hourly rates employed in the district in which the reviewing court sits." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quotations and citation omitted). "If the Court finds that some of the time [the attorney billed] was not reasonably necessary[,] it should reduce the time for which compensation is awarded accordingly." *Mister Softee, Inc. v. Konstantakakos*, No. 15-CV-4770 (SJ)(SMG), 2016 WL 11445964, at *6 (E.D.N.Y. June 27, 2016), *R&R adopted*, 2016 WL 4250314 (E.D.N.Y. Aug. 11, 2016) (quotation and citation omitted). "Where time entries are vague, duplicative, or otherwise inadequate, a court may make 'an across-the-board reduction or percentage cut, in the amount of hours.'" *Id.* (quoting *T.S. Haulers, Inc. v. Cardinale*, No. 9-CV-0451 (SJF)(ARL), 2011 WL 344759, at *3 (E.D.N.Y. Jan. 31, 2011)). "Inadequate documentation" is another "ground[ ] for reduction of a fee award." *Bercosa Corp.*, 666 F. Supp. 2d at 299 (citation omitted).

"In determining the reasonableness of the requested attorneys' fees, the Court considers the quality of the work done by the attorneys." *Harris v. Fairweather*, No. 11-CV-2152 (PKC)(AJP), 2012 WL 3956801, at *8 (S.D.N.Y. Sept. 10, 2012), *R&R adopted*, 2012 WL 5199250 (S.D.N.Y. Oct. 19, 2012). For example, in *Harris*, the court found that "[t]he poor quality of counsel's work," which included "mediocre" documents that had "numerous errors, and failed to cite to authority for much of the relief requested," "justifie[d] a reduction in the fee award." *Id.* (footnote omitted); *see also Gordon v. Site 16/17 Dev., LLC*, No. 11-CV-427 (RMB)(AJP), 2011 WL 3251520, at *6 (S.D.N.Y. July 28, 2011), *R&R adopted* (Aug. 30, 2011 Order, Dkt. 47) ("The poor quality of counsel's work justifies an even greater reduction in the fee award.").

Plaintiffs' counsel repeatedly submitted subpar materials to the Court. The Motion and the materials submitted in support thereof were virtually unusable. Each Plaintiffs' declaration was internally inconsistent and inconsistent with the allegations in the Complaint. The Excel spreadsheet (Dkt. 63-16) that counsel submitted in support of the Motion was also flawed. Counsel included in the spreadsheet damages for which Plaintiffs were ineligible. For example, none of the "Hours Per Week in Period" for Alfaro are greater than forty. Nonetheless, counsel inexplicably calculated Alfaro's overtime pay for each of those weeks. (*See id.*) *See Crowhurst v. Szczucki*, No. 16-CV-182 (BAF)(GWG), 2019 WL 6122645, at *11 (S.D.N.Y. Nov. 19, 2019), *R&R adopted*, 2020 WL 133509 (S.D.N.Y. Jan. 11, 2020) (citing counsel's pursuit of "damage claims [that] had no argument to justify the[m]" as an example of "[t]he quality of work by [ ] counsel [that] point[ed]" to lower attorneys' fees).

Plaintiffs' counsel was afforded ample opportunities to rectify these errors. Counsel submitted two motions for default judgment and an Amended Memorandum in Support of the Motion. Because it was unclear which documents Plaintiffs intended to be considered, Plaintiffs were directed further to file a superseding version of their motion on July 12, 2020, which Plaintiffs did on July 24, 2020. Counsel could have taken any of those opportunities to address these problems. They did not.

Because of these serious deficiencies, the Court was compelled to do counsel's work for them. This required numerous approximations and determinations, such as the start and end dates of overlapping pay periods, in order to determine the Defaulting Defendants' liability and the extent of the damages. *See Gesualdi v. Cirillo*, No. 9-CV-4570 (KAM)(JMA), 2011 WL 666196, at *5 (E.D.N.Y. Jan. 3, 2011), *R&R adopted*, 2011 WL 666197 (E.D.N.Y. Feb. 14, 2011) (reducing the attorneys' fees request "in light of the many calculation errors throughout plaintiffs' affidavit, and the considerable time th[e] Court had to spend rectifying them").

Counsel also ignored an explicit Court order when filing the Motion.  On July 12, 2020, Plaintiffs were "directed to email a courtesy Excel version of any spreadsheet included with the Motion to" the Court.  (July 12, 2020 Order.)  Counsel never did so.  *See Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 32 (2d Cir. 2014) (summary order) (holding that the district court did not abuse its discretion in denying the motion for attorneys' fees when counsel ignored a court order to submit further information with respect to damages and attorneys' fees).

Finally, many of counsel's descriptions of their work on this case are vague.  For example, at least five entries are "discussed case" or "discussed status of case" without any further information about the purpose of the conversation.  (*See* 63-17 at 1-2.)  Similarly, three entries are for "research Defendants," "review research of Defendants," and "research defendants."  (*Id.*)  Two further entries are for "conference[s]" regarding the research into Defendants.  (*Id.* at 2.)  Another entry is for a "conference with [another lawyer] re: strategy and telephone cls."  (*Id.* at 4.)  Vague billing entries like these warrant a reduction in the fees sought by counsel.  *See Mister Softee, Inc.*, 2016 WL 11445964, at *7 (reducing the hours worked where, *inter alia*, "[a] number of billing entries seem to be inappropriately vague").

Accordingly, it is respectfully recommended that the attorneys' fees be reduced by forty percent, resulting in an attorneys' fee award of $1,029.96.  *See Dixon v. Agbai*, No. 15-CV-850 (AT)(AJP), 2016 WL 3702749, at *17-18 (S.D.N.Y. July 8, 2016), *R&R adopted*, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016) (reducing the amount of attorneys' fees sought by forty percent after considering, *inter alia*, the quality of the attorneys' work and that some time entries were vague); *see also Harris*, 2012 WL 3956801, at *8 ("In light of the mediocre attorney performance, the vague billing entries and excessive time spent on certain tasks, the Court should reduce the attorneys' fees sought by twenty percent . . . ."); *Gordon*, 2011 WL 3251520, at *6 (finding that the attorneys' fees should be reduced by 20% in light of "[t]he poor quality of counsel's work"); *Resol. Tr. Corp. v. 12A Assocs.*, 782

F. Supp. 270, 272 (S.D.N.Y. 1992) (finding that attorneys' fees were not warranted when the attorneys' actions "indicate[d] to the Court that their performance as officers of the Court has been sub-standard and unprofessional").

### B.    Costs

Plaintiffs seek $733.40 in costs, which includes $400 for filing the Complaint and $333.40 for serving the Defaulting Defendants.  (Memo. at 11; Dkt. 63-17 at 5.)

The filing fee is reasonable and it is respectfully recommended that it be awarded to Plaintiffs. *See Joe Hand Promotions, Inc. v. Bernal*, No. 18-CV-85 (ILG)(SJB), 2019 WL 885930, at *6 (E.D.N.Y. Feb. 22, 2019) (awarding plaintiff the $400 filing fee after taking judicial notice of it).  However, it is respectfully recommended that Plaintiffs not be awarded the costs of the process servers where Plaintiffs' counsel has failed to submit documentation to support those costs.  This is not the first time this law firm has been denied costs for failing to submit such documentation.  *See Soto v. Los Corbaticas Deli Grocery II Corp.*, No. 18-CV-3602 (JGK)(JLC), 2018 WL 4844018, at *9 (S.D.N.Y. Oct. 5, 2018), *R&R adopted*, 2018 WL 6173713 (S.D.N.Y. Nov. 23, 2018) ("[T]he Faillace firm has not submitted underlying documentation for the process server fees, and simply provided their own billing records."); *see also Joe Hand Promotions, Inc. v. Elmore*, No. 11-CV-3761 (KAM)(SMG), 2013 WL 2352855, at *12 (E.D.N.Y. May 29, 2013). ("Although the court takes judicial notice of this district's filing fee amount of $350, the court finds that Plaintiff has failed to submit adequate documentary evidence in support of its request for $150 in service costs and therefore denies Plaintiff's request for reimbursement of such service costs." (collecting cases where courts declined to award costs when the moving party failed to provide documentary evidence)).

<u>**CONCLUSION**</u>

Based on the foregoing, the undersigned respectfully recommends that the Motion be granted in part and denied in part.  Specifically, the undersigned respectfully recommends finding that: (1)

Saavedra was not paid the applicable minimum wage from May 1, 2012 to December 31, 2012 and from January 1, 2014 to January 13, 2017; (2) Alfaro was not paid the applicable minimum wage from February 1, 2013 to September 13, 2017; (3) Montejo was not paid the applicable minimum wage from December 31, 2013 to September 13, 2017; (4) Saavedra and Montejo were not paid overtime; and (5) Plaintiffs stated claims for breach of NYLL § 195(1)(a) and § 195(3).

The undersigned respectfully recommends that the Motion be denied with respect to (1) Plaintiffs' FLSA claims prior to February 13, 2015; (2) Saavedra's minimum wage claim from March 1, 2013 to December 31, 2013; (3) Montejo's minimum wage claim from June 1, 2013 to December 30, 2013; (4) Alfaro's overtime claim; and (5) Montejo's overtime claim after December 31, 2015.

The undersigned respectfully recommends that damages be awarded as follows:

- Saavedra:
  - $8,178.00 for minimum wage shortfall
  - $18,782.10 for unpaid overtime
  - $5,000 for failure to pay wage notice
  - $5,000 for failure to pay wage statement
  - $26,960.00 for liquidated damages
  - Total: $63,920.00
- Alfaro:
  - $14,732,00 for minimum wage shortfall
  - $5,000 for failure to pay wage notice
  - $5,000 for failure to pay wage statement
  - $14,732.00 for liquidated damages
  - Total: $39,464.00
- Montejo:
  - $11,822.00 for minimum wage shortfall
  - $15,105.00 for unpaid overtime
  - $5,000 for failure to pay wage notice
  - $5,000 for failure to pay wage statement
  - $26,927.00 for liquidated damages
  - Total:  $63,854.00

Additionally, the undersigned respectfully recommends that prejudgment interest be assigned as follows:

- Saavedra: $6.65 from January 6, 2015 until the date of entry of judgment
- Alfaro: $3.63 from May 24, 2015 until the date of entry of judgment

- Montejo: $6.64 from July 23, 2015 until the date of entry of judgment

Finally, it is respectfully recommended that Plaintiffs' counsel be awarded $1,029.96 in attorneys' fees and $400.00 in costs.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          February 16, 2021